J-S25005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
         :         PENNSYLVANIA
         :
     v.         :
         :
         :
YAMEEN MOFIELD         :
         :
      Appellant       :    No. 2920 EDA 2023

Appeal from the Judgment of Sentence Entered October 6, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008014-2021

COMMONWEALTH OF         :      IN THE SUPERIOR COURT OF
PENNSYLVANIA         :         PENNSYLVANIA
         :
         :
         :
     v.         :
         :
         :
YAMEEN MOFIELD         :
         :    No. 2921 EDA 2023
      Appellant

Appeal from the Judgment of Sentence Entered October 6, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008015-2021

BEFORE: PANELLA, P.J.E., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:      **FILED SEPTEMBER 18, 2025**

Yameen Mofield appeals from the judgment of sentence, an aggregate term of 45 to 90 years' incarceration, entered in the Court of Common Pleas of Philadelphia County after a jury convicted him of third-degree murder, conspiracy, aggravated assault, and various firearms offenses. In this consolidated appeal, Mofield challenges the sufficiency of the evidence to

sustain his third-degree murder and conspiracy convictions, the trial court's evidentiary rulings, and the discretionary aspects of his sentence. After careful consideration, we affirm.

This case arises out of a series of retaliatory shootings between two rival South Philadelphia gangs that led to an incident during which Mofield and other 31st Street gang members opened fire on a gas station, killing 15-year-old R.B. and wounding two others, K.B. and Q.B. Mofield was subsequently arrested and charged with, *inter alia*, murder, attempted murder, conspiracy to commit murder, aggravated assault, possessing instruments of crime ("PIC"), firearms not to be carried without a license, and carrying firearms on public streets in Philadelphia.[1] The Honorable Charles A. Ehrlich comprehensively summarized the evidence and testimony presented at the joint trial of Mofield and Hanef Wilkins, coconspirator and fellow 31st Street gang member, as follows:

> Philadelphia Police Sergeant Carmen Palmiero testified that he was at the Philadelphia Police First District at around 8:00 p.m. on October 4, 2018, when a young black male, later identified as K.B., ran into the lobby bleeding and claimed that he had been shot at a gas station. At the same time, police received multiple calls reporting a shooting at 25th and Passyunk. Sergeant Palmiero subsequently responded to the gas station at 2435 West Passyunk Avenue, located around the corner from the First District. Upon arrival, Sergeant Palmiero was directed to the rear of the gas station, where he found an unresponsive black male on the ground covered in blood. Sergeant Palmiero and his partner immediately transported the male, later identified as fifteen-year-

---

[1] 18 Pa.C.S.A. §§ 2502, 901(a), 903(c), 2702(a), 907(a), 6106(a)(1), and 6108, respectively.

old R.B., in the back of their police vehicle to Presbyterian Hospital. R.B. was pronounced dead at the hospital at 8:35 p.m. Jacqueline Nichols testified that R.B. was her grandson, born on March 19, 2003, and that she last saw him alive on October 3, 2018, when he visited her at her house.

Philadelphia Police Detective Ralph Domenic testified that he was assigned to investigate R.B.'s murder. Detective Domenic went to the scene of the murder and was able to recover video footage from the gas station where the murder occurred. The Commonwealth and counsel for [Mofield] and Wilkins stipulated that video was recovered from the gas station at 2435 West Passyunk Avenue and surrounding areas which depicted the shooting on October 4, 2018.

Philadelphia Police Detective Thorsten Lucke, an expert in digital surveillance, video recovery, and analysis, testified that he created a compilation of video footage of the shooting. The footage showed a vehicle traveling westbound and pulling up to the gas station, shooting at individuals who could be seen standing around the gas station, then traveling west toward 25th Street after the shooting concluded. A slowed-down and zoomed-in version of this same footage showed an individual leaving the shooting vehicle through the front passenger side door and a second individual inside the vehicle by the passenger side rear door. Visible muzzle flashes and disturbances captured by the infrared cameras indicated that both individuals were sources of gunfire. This footage also showed an individual with a gun running and reentering the vehicle prior to the vehicle driving away. Detective Lucke testified that police were unable to obtain any additional footage which showed the continued path of travel for the vehicle involved in the shooting.

Philadelphia Police Officer Terry Tull testified that at 9:45 p.m. on October 4, 2018, he assisted with processing the scene at 2435 West Passyunk Avenue. Officer Tull testified that several pieces of physical evidence were recovered from the scene, including ballistic evidence, swabs of blood stains, a black book bag, and a black hooded sweatshirt. …

Dr. Lindsay Simon, an expert in forensic pathology, testified that on October 5, 2018, she performed an autopsy on R.B. Dr. Simon concluded that R.B.'s cause of death was a gunshot wound of the torso and that the manner of his death was homicide. Dr. Simon

testified that the gunshot entered through the left side of R.B.'s back and exited through the left side of his chest, perforating two [] of his ribs, his aorta, and multiple areas of his heart. Based on the lack of stippling on R.B.'s body, Dr. Simon estimated that the gun was fired at least two [] to three [] feet away.

On October 5, 2018, the day after the murder, Detective Domenic received information that some statements were made during the execution of a search warrant at [Mofield's] residence which potentially implicated him in the murder. The Commonwealth and counsel for [Mofield] and [] Wilkins stipulated that while Philadelphia Police Officer Matthew York was executing a search warrant at 2832 Aramingo Avenue, [Mofield's] mother asked if [Mofield] had anything to do with what happened at the gas station the day before, which would have been October 4, 2018.

\*\*\*

Detective Domenic testified that on October 18, 2018, Philadelphia Police Officer Christopher Lai gave him the names of several possible suspects for the murder: [Mofield], Nyseem Smith, and Kameron Purnell. Officer Lai testified that he was assigned to the Seventeenth Police District in South Philadelphia for almost fifteen [] years and knew many people from the neighborhood from his time patrolling there, including R.B.'s family and Q.B.'s family. In 2016, Officer Lai helped police determine that shootings occurring in the Grays Ferry area were related to two [] groups. Multiple reports compiled from recovered firearms and fired cartridge casings showed a pattern of back-and-forth shootings on 27th Street and 31st Street. Based on conversations with people in the neighborhood and social media posts he found, Officer Lai determined that there were two [] gangs — one representing 27th Street and the other representing 31st Street — which had come into conflict with each other.

Officer Lai testified that he began monitoring gang activity on social media and found that members of both gangs were active on Instagram and YouTube. Officer Lai identified Instagram accounts belonging to [Mofield] and [] Wilkins, both of which had usernames that referenced 31st Street. Officer Lai recognized numerous individuals who were associated with the 31st Street gang, including [Mofield], Wilkins, Khalid Harrison, [] Smith, [and Tymeir Shands.] Officer Lai testified that in the process of investigating the Grays Ferry shootings, police began recovering

stolen vehicles used in these shootings close to the home addresses of the known 31st Street gang members. Officer Lai testified that he knew the nicknames used by individuals associated with the 31st Street gang, identifying [Mofield's] nickname as "Su" or "Su-Su" and Wilkins' nickname as "Nu" or "Nuski." [N.T. Trial, 6/13/2023, at 86.]

On December 5, 2018, Detective Domenic interviewed Dean Fosque after learning that Fosque had information regarding the murder of R.B. [Fosque] confirmed that he was questioned by homicide detectives on that date, but stated that the questioning was not recorded and that he was not asked to review or sign a statement afterward. Police wrote in a statement that Fosque had stated "that his cousin, who he identified as Yuseem, a.k.a. 'Su Su', told him that he (Yuseem) did a murder at the gas station on Passyunk near Wilson Park Projects a few months back." [N.T. Trial, 6/12/23, at 164.] Fosque testified that when questioned in front of a grand jury on March 11, 2021, he stated that he knew a "Yameen" who went by the nickname Su-Su. Fosque told the grand jury that Su-Su had tried selling him a stolen car on Instagram, that Su-Su was on the run at this time, and that he had heard that Su-Su had committed a homicide. Fosque denied giving any of these details to the grand jury and failed to correctly identify Su-Su in the courtroom.

According to Detective Domenic, Fosque stated that [Mofield] had told him that he was involved in the murder on Passyunk Avenue. Fosque told Detective Domenic that [Mofield] was trying to sell him a stolen car so he could have enough money to get out of town because he had seen himself on the news in connection with the murder. [Mofield] told Fosque that he was the individual wearing a hood chasing a boy in the video footage, but that he would not be able to be identified because of the hood. Detective Domenic testified that Fosque also positively identified a photo of [Mofield].

Agent Christopher Marano, the Section Director of the Gun Violence Task Force in the Pennsylvania Attorney General's Office, testified that he led an investigation into the rivalry between 27th Street and 31st Street in South Philadelphia which put him into contact with Nyseem Smith. Smith testified that he grew up near 31st Street and Tasker Street and that people from 31st Street had "beef" with people from 27th Street. [N.T. Trial, 6/13/23, at 145-47.] Smith testified that people from 31st Street and 27th

Street shot at each other because of this beef and that's "just how it was." [**Id.** at 147.] Smith testified that he later got involved with this conflict and that he and his friends from 31st Street would share guns and use them while driving stolen cars through 27th Street territory. Smith and his friends would shoot back at anyone who shot at them and would also target someone that they spotted.

Smith testified that he and his friends from 31st Street were active on social media and that they would sometimes make music videos which attacked 27th Street. Smith stated that most of the people present in these music videos were 31st Street gang members and specifically identified [Mofield] and [] Harrison in a screenshot taken from one of these music videos. Smith also identified numerous individuals seen in photographs posted to Instagram, including [Harrison, Shands, Wilkins], and himself. Smith testified that these individuals were connected to 31st Street and that he had committed shootings and traded guns with some of them. Smith identified both [Mofield] and Wilkins in the courtroom. Smith stated that Wilkins was younger than him but that they sometimes hung out and that he also sometimes hung out with [Mofield].

\*\*\*

Smith additionally gave statements regarding a series of shootings that occurred from October 17, 2017, to July 16, 2020. Smith identified [Harrison, Shands, and himself, among others,] as 31st Street gang members who participated in these shootings, which were largely committed using stolen vehicles and targeted at known members of the 27th Street gang. Smith agreed that he was personally involved in shooting incidents where a total of nineteen [] people were shot at, and that he was involved in a shooting on December 19, 2017, which resulted in the death of Nasir Livingston.

\*\*\*

Smith also gave a signed statement regarding the murder of R.B. on October 4, 2018[] at 2548 Passyunk Avenue. Smith stated that on the night of the murder, he was with his cousin Devon Jacobs, [Shands, and others] at Jacobs' house at 1600 Napa Street. Smith testified that after the shooting, [] Harrison, [] Wilkins, [Mofield], and another person came to the house. Smith did not know the

fourth person but identified him in his statement to police as "a young boy named Markell." [N.T. Trial, 6/14/23, at 48.] Harrison, Wilkins, and [Mofield] told Smith and the others present that somebody had been shot and killed at a gas station on Passyunk.

[Mofield] told the group that they had rode through Wilson Park and "saw Jameir pumping gas at the gas station" as they were coming out. [*Id.* at 50.] [Mofield] then said that they spun around and found Jameir gone, but that they still started shooting when they saw a couple other people from Wilson. [Mofield] said that he started chasing "Naseem's little brother" and that he knew he hit him with his gun. [*Id.* at 58.] Additionally, [Mofield] stated that he had dropped his phone at the scene. Smith told police in his statement that Harrison had a PPX9 handgun, [Mofield] had a .9 Taurus pistol, and Wilkins had a .38 revolver, and that he did not know if Markell had a gun. Smith later positively identified a photograph of Markell Grasty that was shown to him by police. Smith told police that the PPX9 had been previously used in the Marston Street triple shooting that he was involved in. Smith also told police that he had watched a video of the shooting on Instagram and was able to identify [Mofield] as the individual seen jumping out of a white vehicle with his face covered and chasing somebody.

Agent Marano confirmed that Smith gave a statement in February 2020 regarding the murder of R.B. Agent Marano reviewed the call detail records for Smith's cell phone and verified that Smith had been present at 1600 South Napa Street at the time the murder occurred. Based on Smith's information that a PPX9 had been used in the homicide and that it had been used in other shootings too, Agent Marano ordered that the ballistic evidence recovered from the homicide at 2548 Passyunk Avenue be crosschecked with ballistic evidence recovered from 1600 South Marston Street and two [] other shootings.

Natalie Murphy, an expert in firearms identification and analysis, testified that she analyzed sixteen [] .9[] Luger fired cartridge casings and five [] bullet specimens recovered from the murder investigation at 2435 West Passyunk Avenue. Ms. Murphy's ballistic analysis revealed that the first eight [] fired cartridge casings were fired from a single firearm while the other eight [] fired cartridge casings were fired from a separate firearm. Ms. Murphy testified that the five [] bullet specimens consisted of one [] intact bullet and four [] bullet jackets. Ms. Murphy concluded

that the intact bullet and bullet jacket 1 were from the .38 or .9[] family of caliber, and that bullet jackets 2 and 4 were fired from the same firearm. Ms. Murphy confirmed that she was requested to conduct a crosscheck against ballistic evidence recovered from other shootings. This crosscheck revealed that the same firearm was used to fire both a group of fired cartridge casings recovered from 1600 South Marston Street and the first group of fired cartridge casings recovered from 2435 West Passyunk Avenue.

Based on information in Smith's statement that [Mofield], [] Wilkins, [] Harrison, and [] Grasty were present at R.B.'s murder, Agent Marano reviewed call detail records for [Mofield], Wilkins, and Harrison. Agent Marano testified that he received location data for [Mofield] and Harrison's cell phones which placed them both in the area of the murder at the time it occurred, but that he was unable to retrieve location data for Wilkins' cell phone. Agent Marano investigated Smith's claim that a phone had been dropped at the scene of the murder and determined that the only phone recovered from the scene belonged to one of the shooting victims.

Amanda McCourtie, a digital forensic analyst with the Philadelphia District Attorney's Office, testified as an expert in cell site analysis, cell phone extraction and analysis, and social media extraction and analysis. …

Ms. McCourtie testified that she was [] tasked with looking into [] Grasty and was provided with an extraction of a cell phone associated with Grasty. From this extraction, Ms. McCourtie found pictures of Grasty holding firearms, videos of Grasty, videos of [Mofield], and a video of Grasty and [Mofield] together. Ms. McCourtie analyzed the connections between the phone number associated with Grasty's phone and phone numbers associated with [Mofield], [] Wilkins, and [] Harrison, and determined that there were communications between the numbers belonging to [Mofield], Wilkins, and Harrison, but that Grasty only had communications with [Mofield]. Ms. McCourtie additionally determined that Grasty followed both Wilkins and Harrison on Instagram and had communicated numerous times with [Mofield] on Instagram.

Ms. McCourtie further testified that she reviewed the contents of [Mofield's] Instagram account and found messages sent from [Mofield's] Instagram account which showed that he was using the same phone number both before and after the shooting. Ms.

McCourtie conducted cell site analysis on that phone number and phone numbers associated with Wilkins, Harrison, and [] Smith. The cell site analysis on Smith's phone revealed that numerous calls were made from 7:20 p.m., shortly before the homicide, until 8:28 p.m., shortly after the homicide. All of these calls utilized the same cell tower which was consistent with the phone remaining stagnant and being used at 1600 South Napa Street.

The cell site analysis on [Mofield's] phone revealed that the phone used a cell tower approximately two [] miles west of the shooting location at 7:35 p.m. At 8:10 p.m. and 8:12 p.m., [Mofield's] phone used the sector of a cell tower pointing in the direction of the shooting. At 8:11 p.m. and 8:15 p.m., [Mofield's] phone used a different cell tower which still pointed in the direction of the shooting. From 9:13 p.m. to 9:31 p.m., [Mofield's] phone used the same cell tower, which pointed in the direction of 1600 South Napa Street. Calls that were placed on [Mofield's] phone from 10:23 p.m. to 11:38 p.m. and the following morning used cell towers near 2832 Aramingo Avenue, [Mofield's] residence at the time. Ms. McCourtie agreed that the call detail records for [Mofield's] phone showed that it was used to place numerous calls both before and after the murder.

*** 

Ms. McCourtie testified that the cell detail records for Wilkins' phone showed several calls to and from Harrison's phone from 7:16 a.m. to 10:31 a.m. on the day of the shooting. There were no call activities on Wilkins' phone between 7:23 p.m. and 8:48 p.m. Ms. McCourtie noted that there were similarly no call activities on [Mofield's] phone between 7:35 p.m. and 8:10 p.m. and no call activities on Harrison's phone between 7:27 p.m. and 8:14 p.m. The shooting took place at approximately 8:00 p.m.

Ms. McCourtie testified that she noticed that one of the calls Harrison's phone made was to a state prison. Ms. McCourtie ultimately determined that the call was made to an inmate named Markell Davis, a 31st Street gang member. Ms. McCourtie listened to all of Davis's recorded prison tapes and testified that two [] calls stood out to her. Ms. McCourtie recognized Harrison's voice on the first call. In this call, which was placed on October 4, 2018, the day of the shooting, Harrison told Davis that he was out on Tasker Street with "Susu and Nunu," who he called "my young

- 9 -

killers ... my young gorillas, my young savages" who were "out here doing big things." [Commonwealth Exhibit 173.]

Ms. McCourtie recognized the voice of [] Shands, a 31st Street gang member, on the second call, which was placed on October 14, 2018, ten [] days after the shooting. In this call, Shands stated that "young bull lil Su" was "on the run" for a "joint." [Commonwealth Exhibit 174.] Davis replied that he had been told about "one of them little young bull getting boxed in … at the gas station." [*Id.*] Shands told Davis that Su was "on tour" for that and that "he said he dropped his phone out there." [*Id.*] Shands added that "it was a good jawn … besides him dropping the phone." [*Id.*] Shands also said to Davis that he had advised the others to "swap the nine." [*Id.*]

\*\*\*

Philadelphia Police Detective Francesco Campbell testified that he was asked to obtain a DNA sample from Wilkins, but that [Mofield] refused to give a DNA sample on multiple occasions. Supervisory Special Agent James Owens testified that an unsuccessful attempt to arrest [Mofield] was made at his last known residence on April 15, 2021. Agent Owens opened a fugitive case for [Mofield] two [] days later. After Agent Owens subsequently learned that [Mofield] was in the area of Atlanta, Georgia, he generated a collateral lead which led to [Mofield's] arrest on May 13, 2021, in South Fulton, Georgia. The Commonwealth and counsel for [Mofield] and [] Wilkins stipulated that neither [Mofield] nor Wilkins had a valid license to carry a concealed weapon.

\*\*\*

[Mofield] and Wilkins' trial commenced on June 8, 2023. On June 21, 2023, after hearing all evidence, closing arguments from counsel, and jury instructions from [the] court, a jury deliberated and found [Mofield] guilty of one [] count each of murder of the third degree, conspiracy to commit murder of the third degree, conspiracy to commit murder, VUFA § 6106, VUFA § 6108, [] PIC, and two [] counts of aggravated assault. [The] court ordered a presentence investigation [("PSI")] report and a mental health evaluation for [Mofield] and deferred sentencing to a later date.

Trial Court Opinion, 11/12/24, at 1-19 (citations to record, brackets, and unnecessary capitalization omitted).

At CP-51-CR-0008015-2021, the court sentenced Mofield to 20 to 40 years' confinement for the third-degree murder conviction and imposed a consecutive sentence of 20 to 40 years for the conspiracy conviction. At CP-51-CR-0008014-2021, the court imposed a consecutive sentence of 5 to 10 years for Mofield's first count of aggravated assault and concurrent sentences of 10 to 20 years for conspiracy to commit attempted murder, 5 to 10 years for the second count of aggravated assault, 3 ½ to 7 years for carrying a firearm without a license, and 2 ½ to 5 years each for carrying firearms in public in Philadelphia and PIC. *See* N.T. Sentencing, 10/6/23, at 38-39. Mofield filed post-sentence motions on October 13, 2023, which the court denied on October 16, 2023 without conducting a hearing. Both Mofield and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Mofield raises the following questions for our review:

A. Was the evidence insufficient to sustain the guilty verdicts for:

1. Murder-3, as [Mofield] did not shoot decedent and did not commit a killing with malice;

2. Conspiracy (Murder-3), as there lacked evidence that [Mofield] agreed with or aided another to kill, with malice, the decedent.

B. Was the admission of voluminous and overwhelming prior bad acts evidence regarding several prior shootings [] overly prejudicial and denied [Mofield] of a fair trial, as a substantial portion of the trial testimony concerned several shootings in which [Mofield] was not involved[?]

- 11 -

C. Were the admission of "co-conspirators'" statements inadmissible hearsay as they did not pertain to any conspiracy between the declarants and [Mofield] regarding this matter, they were not made during the course of any conspiracy in this matter, and there lacked sufficient evidence of any conspiracy, beyond the statements, that would permit their use under any hearsay exception?

D. Did the [trial court] abuse discretionary aspects of sentencing by entering an excessive consecutive-in-nature sentence that was more than necessary to protect the public, vindicate the decedent's family, overly harsh in light of the numerous mitigating factors and [Mofield's] need for rehabilitation (to include mental health treatment) and his youth, being a [16] year old child at the time of the offense[?]

Appellant's Brief, at 5-6 (questions reordered for ease of disposition; formatting altered; argument omitted).

In his first issue, Mofield challenges the sufficiency of the evidence to sustain his convictions for third-degree murder and conspiracy to commit third-degree murder.

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

*Commonwealth v. Scott*, 325 A.3d 844, 849 (Pa. Super. 2024) (brackets and citation omitted). "Whether evidence was properly admitted does not factor into our analysis, as sufficiency is not determined on a diminished record." *Commonwealth v. Williamson*, 330 A.3d 407, 417 (Pa. Super. 2025).

Mofield avers the Commonwealth's evidence was insufficient to sustain his conviction for third-degree murder because he "did not shoot [R.B.] or commit any killing with any malice and was not a participant in the other acts shootings that were introduced by the Commonwealth to establish motive." Appellant's Brief, at 40. Mofield also avers the Commonwealth's evidence was insufficient to sustain his conviction for conspiracy to commit third-degree murder because he "did not agree or aid any [31st] Street 'affiliates' to kill [R.B.], and the motive other acts evidence had nothing to do with [Mofield]." *Id.* We disagree.

Our Criminal Code defines third-degree murder as "[a]ll other kinds of murder" that do not constitute an intentional killing or a killing committed during the perpetration of a felony. 18 Pa.C.S.A. § 2502(c). To sustain a conviction for third-degree murder, the Commonwealth must establish "(1) an intentional act, (2) done with malice, that (3) results in an unintentional killing." *Commonwealth v. Arrington*, 247 A.3d 456, 461 (Pa. Super. 2021) (citation omitted).

> Malice includes not only particular ill will toward the victim, but also wickedness of disposition, hardness of heart, wantonness,

and cruelty, recklessness of consequences, and conscious disregard by the defendant of an unjustified and extremely high risk that his actions may cause serious bodily harm.

*Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021) (citations omitted).

Under Pennsylvania law, conspiracy to commit third-degree murder is a cognizable offense. *See Commonwealth v. Fisher*, 80 A.3d 1186, 1196 n.6 (Pa. 2013).

To sustain a conviction for conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy. Conspirators need not contemplate the ultimate crime in order to be charged and convicted of conspiracy to commit that crime.

*Commonwealth v. Arrington*, 247 A.3d 456, 461 (Pa. Super. 2021) (unnecessary capitalization, citations, and internal quotation marks omitted); 18 Pa.C.S.A. § 903. Because it is often difficult to prove the existence of an explicit or formal agreement in a conspiracy case, "the agreement is generally established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." *Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009) (citations and internal quotation marks omitted). "The conduct of the parties and the circumstances surrounding their conduct may create a 'web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa. Super. 1998) (*en banc*)

(citation omitted). Moreover, "[the] overt act need not be committed by the defendant; it need only be committed by a co-conspirator." ***Id.*** (citation omitted). Regarding the element of shared criminal intent, our Supreme Court has explained, "[w]here[] the defendant intends the underlying act [] which results in death, the evidence supports the charge of conspiracy to commit third degree murder." ***Fisher***, 80 A.3d at 1195.

Based on the voluminous evidence presented at trial, the trial court properly rejected Mofield's sufficiency challenge. Viewing the evidence in the light most favorable to the Commonwealth, it established that Mofield was a known member of the 31st Street gang, which had an ongoing conflict with the 27th Street gang. As part of this conflict, members of the 31st Street gang would drive through 27th Street territory looking to shoot anyone associated with the 27th Street gang.

> The shooters who targeted and struck R.B., K.B., and Q.B. — all of whom were minors — exhibited clear malice. The shooters drove up to the gas station where R.B., K.B., and Q.B. were hanging out and immediately began shooting at them, having recognized their association with a rival gang. Based on the number of fired cartridge casings recovered from the crime scene, the shooters fired at least sixteen [] gunshots at the group of teenagers[, killing R.B. and injuring K.B. and Q.B.]
>
> Smith identified [Mofield] as one of the shooters, along with Wilkins and Harrison[.] … The record also reflects that at least two [] pieces of ballistic evidence were determined to possibly originate from … the exact type of firearm that [Mofield] was carrying according to Smith. Even though only two [] individuals were identified as shooters in the video footage, there was sufficient circumstantial evidence to conclude that in the light most favorable to the Commonwealth as the verdict winner, there was a third shooter not captured by the video footage.

- 15 -

> There was therefore sufficient evidence for a jury to conclude that [Mofield] was one of the three [] shooters who maliciously shot at a group of teenagers standing at a gas station, killing R.B., and was therefore guilty of murder of the third degree.
>
> Additionally, … [b]y committing the shooting, [Mofield], Wilkins, and Harrison all committed overt acts in furtherance of their shared goal to bring harm to those associated with 27th Street. There was thus sufficient evidence to find [Mofield] guilty of both conspiracy to commit murder of the third degree and conspiracy to commit murder. Accordingly, despite surveillance footage showing only two [] shooters at the scene of the crime, there would still be sufficient evidence to find [Mofield] guilty of murder of the third degree under a theory of conspiratorial liability. R.B.'s death was a natural and probable result of a conspiracy designed to fire gunshots at anyone associated with 27th Street.

Trial Court Opinion, 11/12/24, at 29-30 (citations to record and unnecessary capitalization omitted). Following an independent review of the certified record and the applicable law, we discern no error in the trial court's analysis and conclusion. As found by Judge Ehrlich, the Commonwealth presented sufficient evidence to support Mofield's convictions for both third-degree murder and conspiracy. Accordingly, Mofield's first issue lacks merit, and he is not entitled to relief.

In his second and third issues, Mofield challenges the trial court's evidentiary rulings.

> We review a challenge to the trial court's evidentiary rulings for an abuse of discretion. Accordingly, our standard and scope of review is limited:
>
> > The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest

- 16 -

unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. Where the evidentiary question involves a discretionary ruling, our scope of review is plenary.

Further, we will affirm a trial court's evidentiary ruling if the result is correct on any ground, without regard to the grounds on which the trial court relied.

***Williamson***, 330 A.3d at 414 (citations and internal quotation marks omitted).

"The general threshold for admissibility of evidence is relevance." ***Commonwealth v. Gad***, 190 A.3d 600, 603 (Pa. Super. 2018). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." Pa.R.E. 401.

Our rules of evidence allow the Commonwealth to introduce other acts evidence under certain circumstances:

**(b) Other Crimes, Wrongs, or Acts.**

(1) *Prohibited Uses.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b). "When weighing the potential for prejudice of evidence of other crimes, wrongs, or acts, the trial court may consider whether and how

much such potential for prejudice can be reduced by cautionary instructions."

Pa.R.E. 404, *Comment* (citation omitted).

> Our Supreme Court has also recognized the *res gestae* exception, permitting the admission of evidence of other crimes or bad acts to tell "the complete story."
>
> Nevertheless, this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice. "Unfair prejudice" means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Thus, the admission of the evidence becomes problematic only when its prejudicial effect creates a danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial.

*Gad*, 190 A.3d at 605 (some quotation marks and citations omitted).

First, Mofield contends the trial court erred in allowing the Commonwealth to introduce evidence of 19 shootings, which "did not prove common plan, scheme and motive pertaining to [Mofield]." Appellant's Brief, at 63. Mofield avers the Commonwealth's evidence of prior bad acts was "overly voluminous, had nothing to do with [Mofield], and concerned events insufficiently connected to [Mofield]." *Id.* at 41.

The Commonwealth avers Mofield waived his challenge to the introduction of 17 other acts shootings because he failed to object to the introduction of this evidence at trial. *See* Appellee's Brief, at 11. Mofield, however, maintains he "objected to the introduction of all of this evidence" at the hearings held on the Commonwealth's motions *in limine*. Appellant's Brief,

- 18 -

at 62. Therefore, as a preliminary matter, we must determine whether Mofield properly preserved this challenge for our review.

"[I]t is well-settled that a party must make a timely and specific objection at trial, and the failure to do so results in waiver of that issue on appeal." **Commonwealth v. McGriff**, 160 A.3d 863, 866 (Pa. Super. 2017) (citations omitted). "Consistent with Pa.R.E. 103(a), a motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court clearly and definitively rules on the motion." **Id.** (ellipses and citation omitted); **see** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Prior to trial, the Commonwealth filed two motions *in limine* seeking to admit evidence of two prior shootings and two recorded prison phone calls.[2] On March 24, 2023, the court held a hearing on the Commonwealth's first motion, pertaining to two other acts shootings that occurred on October 18, 2017 at 1400 S. Etting Street and on April 22, 2020 at 5300 Greenway

_____

[2] Neither the criminal docket nor the certified record include Mofield's response to the Commonwealth's motions *in limine*. **See Commonwealth v. Midgley**, 289 A.3d 1111, 1120 (Pa. Super. 2023) ("Although the clerks of courts are responsible for maintaining and transmitting records in cases, it ultimately is the duty of the appellant to ensure that the certified record is complete. The appellant's failure to carry out that duty results in waiver of any claim for which a needed item is absent from the certified record.") (citations omitted). Accordingly, we cannot determine whether Mofield preserved this challenge for appellate review by arguing against the introduction of all other acts shootings in his response to the Commonwealth's motion, if one were indeed filed.

- 19 -

Avenue. It was at this hearing that the prosecution and the defense presented legal arguments addressing the admissibility of these specific shootings; the Commonwealth's contention was that they established a continued and sustained pattern of gun violence between the gangs. *See* N.T. Hearing, 3/24/23. On March 30, 2023, the court granted the Commonwealth's motion *in limine* pertaining to these shootings, upon determining that the evidence was indicative of an ongoing conspiracy and would explain the motive for R.B.'s shooting and augment "the completeness of the story, including [31st Street's] modus operandi of stealing cars, using them in shootings, trading multiple guns[,]" and shooting 27th Street members at random. N.T. Hearing, 3/30/23, at 11. However, on appeal, Mofield attempts to challenge the admission of evidence of an additional 17 shootings which were introduced at trial, despite defense counsel's failure to launch a timely objection to the introduction of this evidence at any point during trial. Pa.R.A.P. 302(a); *McGriff*, 160 A.3d at 866. Therefore, we agree with the Commonwealth that Mofield has waived his challenge to the introduction of the additional 17 shootings for our review because he failed to raise it before the trial court.

Moreover, the trial court properly exercised its discretion in admitting both the October 18, 2017 shooting at 1400 S. Etting Street and the April 22, 2020 shooting at 5300 Greenway Avenue into evidence as highly relevant to: contextualize the ongoing war between the 27th Street and 31st Street gangs; illustrate "an ongoing conspiracy by members of 27th Street and 31st Street

gangs to continuously shoot at and war with each other[;]" establish that Mofield and Wilkins, "who were both connected to the 31st Street gang, had a motive to shoot and kill R.B. based on his connection to the rival 27th Street gang[;]" provide the complete story of the sequence of events that preceded and followed R.B.'s murder; and demonstrate 31st Street's modus operandi. Trial Court Opinion, 11/12/24, at 47-48; *see Commonwealth v. Brewington*, 740 A.2d 247, 252 (Pa. Super. 1999) (finding "evidence of gang activity" was "highly probative of whether a conspiracy existed"). Based on the foregoing, the court concluded the probative value of this evidence outweighed its potential for unfair prejudice, and we see no reason to disturb its determination. *See Williamson*, 330 A.3d at 414. Furthermore, to mitigate the potential for the jury to consider the other acts evidence in an unduly prejudicial manner, the trial court gave special limited purpose instructions both before the other acts testimony was presented and prior to jury deliberations. *See* N.T. Trial, 6/13/23, at 94-95; *see* N.T. Trial, 6/20/23, at 220; *see Commonwealth v. Harrington*, 262 A.3d 639, 645 (Pa. Super. 2021) ("We presume that jurors, when given a cautionary instruction, have followed the instruction."). Accordingly, Mofield is not entitled to relief on this evidentiary challenge.

Next, Mofield challenges the trial court's admission of a recorded prison phone call between Harrison and Markell Davis. Mofield avers the statements of his co-conspirators were inadmissible hearsay because "they were not made

in the course of any conspiracy, and there lacked any evidence to support [Mofield] participated in any conspiracy." Appellant's Brief, at 41. Mofield further alleges his right to confront these witnesses was violated. *See id.* We disagree.

Our Rules of Evidence permit the admission of a statement "made by the party's coconspirator during and in furtherance of the conspiracy[,]" as an exception to the rule against hearsay. Pa.R.E. 803(25)(E).

> Application of the coconspirator exception to the hearsay rule is predicated on agency principles—when the elements of the exception are established, each conspirator is considered an agent of the other, and therefore, a statement by one represents an admission by all. The exception contains three elements: (1) the existence of a conspiracy between the declarant and the defendant must be demonstrated by a preponderance of the evidence; (2) the statements must be shown to have been made during the course of the conspiracy; and (3) they must have been made in furtherance of the common design.

*Commonwealth v. Holt*, 273 A.3d 514, 543 (Pa. 2022) (quotation marks, citations, and brackets omitted).

The trial court explained its decision to admit the call between Harrison and Davis into evidence as follows:

> This call was relevant to the murder of R.B., as it was made mere hours before the murder occurred and involved Harrison, who pled guilty to his involvement in the murder. In the call, Harrison stated that he was with [Mofield] and [Wilkins], placing the three [] of them together on the day of the murder. The phone call was thus highly relevant to proving [Mofield's] connection to Harrison and [Wilkins] and his involvement in the murder of R.B.
>
> [T]he evidence presented by the Commonwealth in its first motion *in limine* to admit other acts established that there was an ongoing conspiracy by members of the 27th Street and 31st Street gangs

- 22 -

to continuously shoot at and war with each other. The recorded prison call constituted further evidence relevant to proving [Mofield's] identity as a member of the 31st Street gang and the intent of the 31st Street gang. In the call, Harrison stated that he was out on Tasker Street with [Mofield] and Wilkins, indicating they were in 31st Street gang territory. Harrison also stated that [Mofield] and Wilkins were "out here doing big things," establishing their connection to the activities of the 31st Street gang. Harrison references 31st Street gang's intent to shoot and war with the rival 27th Street gang by referring to [Mofield] and Wilkins as his "young killers" and "young savages."

Furthermore, the recorded prison call helped provide a complete story of the hours leading up to the murder of R.B. Cell phone location data and Instagram messages, both of which were ultimately presented at [Mofield's] trial, verified Harrison's statement on the phone call that he was in the area of Tasker Street with [Mofield] and Wilkins on the morning of the murder. The recorded prison call was thus part of the sequence of events which became part of the history of the case and formed part of the natural development of the facts. The prejudicial effects of the call, including its reference to [Mofield] as one of Harrison's "young killers," were outweighed by its probative value in establishing identity and intent and providing the complete story of the sequence of events leading up to the murder of R.B.

Trial Court Opinion, 11/12/24, at 52-53. We discern no abuse of discretion.

The record was replete with evidence establishing that Mofield and Harrison were members of the 31st Street gang and that there was an ongoing conspiracy amongst 31st Street members to shoot rival gang members. On the phone call, Harrison communicated the latest developments in their ongoing war with 27th Street to Davis, a fellow 31st Street member. The trial court properly admitted the phone call under the coconspirator exception. Moreover, Mofield fails to cite any case law to support or otherwise meaningfully develop his Confrontation Clause claim, and we therefore need

not address it further*. **See** Pa.R.A.P. 2119(a); **see Commonwealth v. Wright**, 314 A.3d 515, 523 (Pa. Super. 2024) (Where appellant does not cite "case law supporting his right to relief, this Court will not address the issue on appeal.") (citation omitted).

Accordingly, Mofield is not entitled to relief, as his evidentiary challenges are waived and meritless.

In his final issue, Mofield challenges the discretionary aspects of his sentence.

> An appeal from the discretionary aspects of sentencing is not guaranteed as a matter of right. Before addressing such a challenge, we must first determine: (1) whether the appeal is timely; (2) whether the appellant preserved his or her issue; (3) whether the appellant's brief includes a [Pa.R.A.P. 2119(f)] concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the Sentencing Code.

**Williamson**, 330 A.3d at 419-20 (citation omitted). Furthermore:

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

**Commonwealth v. Verma**, 334 A.3d 941, 946 (Pa. Super. 2025) (citations and quotation marks omitted).

Mofield has properly invoked our jurisdiction to review his discretionary sentencing challenge by filing a timely notice of appeal, preserving his claims in a post-sentence motion, including a Pa.R.A.P. 2119(f) statement in his brief,

and raising a substantial question by alleging that the court imposed excessive consecutive sentences and failed to consider his rehabilitative needs and mitigating factors. *See Commonwealth v. Swope*, 123 A.3d 333, 340 (Pa. Super. 2015) (finding "[a]ppellant's challenge to the imposition of his consecutive sentences as unduly excessive, together with [] claim that the court failed to consider [] rehabilitative needs and mitigating factors upon fashioning its sentence present[ed] a substantial question."). Accordingly, we may review the merits of Mofield's sentencing challenge.

We apply the following well-settled standard of review to a discretionary sentencing challenge:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Verma*, 334 A.3d at 946 (citation omitted).

"When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S. § 9721(b), including the protection of the public, the gravity of the offense in relation to the impact on the victim and the community, and the rehabilitative needs of the defendant." *Id.* (brackets and citation omitted). However, where a PSI report exists, we "presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory

factors." ***Commonwealth v. Watson***, 228 A.3d 928, 936 (Pa. Super. 2020) (citation omitted).

Mofield avers his sentence: (1) was excessive because he was a juvenile when he committed the crimes; (2) was beyond what was necessary to rehabilitate him, protect the public, and vindicate R.B. and his family; and (3) punished him for several bad acts shootings committed by others in contravention to ***Commonwealth v. Berry***, 323 A.3d 641 (Pa. 2024). Appellant's Brief, at 40. Mofield further contends the trial court abused its discretion by sentencing him to "what approaches a [*de facto*] life sentence" of 45 to 90 years. ***Id.*** We disagree.

Mofield's sentences fall within the standard range of the sentencing guidelines, and none exceed the statutory maximum. ***See Verma***, 334 A.3d at 947 ("[W]here a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code.") (citation omitted). Moreover:

> It is well-established that the imposition of consecutive rather than concurrent sentences lies within the sound discretion of the sentencing court. Defendants convicted of multiple offenses are not entitled to a volume discount on their aggregate sentence. Further, we will not disturb consecutive sentences unless the aggregate sentence is grossly disparate to the defendant's conduct, or viscerally appears as patently unreasonable.

***Commonwealth v. Pisarchuk***, 306 A.3d 872, 881 (Pa. Super. 2023) (quotation marks, brackets, and citation omitted).

Our review of the record confirms that the sentencing court considered "the sentencing guidelines, the sentencing code, the arguments of counsel, [the] presentence report, [the] presentence memorandum from the Commonwealth[,] as well as [what was] said on both sides from family members and others [] at the sentencing hearing[,] and particularly the facts and circumstances of [the] case" prior to imposing Mofield's sentence. N.T. Sentencing, 10/6/23, at 36. The court weighed these factors against the protection of the public and the danger it believed Mofield posed. **See** N.T. Sentencing, 10/6/23, at 37, 39-40. The court had the benefit of a PSI, and therefore, we presume it adequately considered and weighed all sentencing factors. **See Watson**, 228 A.3d at 936.

Furthermore, Mofield's reliance on **Berry** is inapt. In **Berry**, our Supreme Court held that a sentencing court may not consider a defendant's arrest record as a sentencing factor. **Berry**, 323 A.3d at 654-56. Here, nothing in the record indicates the trial court impermissibly considered Mofield's arrest record as a sentencing factor. Nonetheless, Mofield contends he "is certainly being punished for" several bad acts shootings testified to at trial, which did not involve him and "did not even result in [his] arrest[,]" because at sentencing, the court stated Mofield was "part of a group that had no problem shooting up a street because the person was in the other group[.]" Appellant's Brief, at 47-48; N.T. Sentencing, 10/6/23, at 39. Contrary to Mofield's contention, our review of the sentencing transcript did not suggest that the

court "imputed conduct of others" onto him or punished him for the other acts shootings. Appellant's Brief, at 40, 45. Rather, the court's comment was merely a broad description of the events that transpired on October 4, 2018.

Finally, to support his contention that the sentencing court imposed a *de facto* life sentence, Mofield relies on ***Miller v. Alabama***, 569 U.S. 460, 483 (2012), in which the Supreme Court determined that a sentencing court must consider a juvenile offender's mitigating qualities of youth prior to imposing a sentence of life without parole ("LWOP") in accordance with the Eighth Amendment's prohibition of cruel and unusual punishment.[3] Mofield avers his sentence constitutes a *de facto* life sentence because he "will be 64 years old at his minimum" and "the average life span for a Black man[] in Philadelphia is now only 65 years old." Appellant's Brief, at 47. We disagree.

Mofield's reliance on ***Miller*** is inapposite, as here, the court did not impose a sentence of LWOP and properly applied "the traditional sentencing considerations under 42 Pa.C.S. § 9721(b)." ***Commonwealth v. Miller***, 275 A.3d 530, 535 (Pa. Super. 2022) (citation omitted). Moreover, in ***Commonwealth v Felder***, 269 A.3d 1232 (Pa. 2022), our Supreme Court

_____

[3] We note that Mofield has incorrectly framed this claim as a challenge to the discretionary aspects of his sentence rather than a challenge to the legality of his sentence. ***See Commonwealth v. Hernandez***, 328 A.3d 1159, 1165 (Pa. Super. 2024) ("A claim that the sentencing court imposed an unconstitutional and *de facto* life sentence in violation of ***Miller*** constitutes a challenge to the legality of the sentence.") (citation omitted) (emphasis added). Accordingly, our standard of review is de novo and our scope of review is plenary. ***Id.***

granted allowance of appeal to consider "whether a discretionary term-of-years sentence may be so long as to amount to a *de facto* life sentence, thereby triggering the substantive and procedural protections afforded by *Miller* and its progeny," and concluded that "even if a 50-years-to-life sentence amount[ed] to a *de facto* life sentence, there [was] no *Miller* problem" present. *Felder*, 263 A.3d at 1235, 1245 (citation omitted). The Court explained its conclusion as follows:

> [I]f a discretionary sentencing scheme is constitutionally sufficient to permit the imposition of a life-without-parole sentence on a juvenile homicide offender, so too can a court impose a sentence that is something less than life without parole. This includes a term-of-years sentence that may amount to a *de facto* life sentence. Stated differently, as long as the sentence was the product of a discretionary sentencing system that included consideration of the juvenile's youth, the Eighth Amendment is satisfied.

*Id.* at 1245. Similarly, here, there is "no *Miller* problem" because Mofield's sentence was the product of a discretionary sentencing scheme that included consideration of his youth. *Id.* As previously discussed, the sentencing court adequately considered the sentencing factors in fashioning Mofield's sentence, and this claim lacks merit.

Therefore, we discern no abuse of discretion by the trial court in sentencing Mofield to an aggregate term of 45 to 90 years' imprisonment. Accordingly, Mofield's sentencing challenges are meritless.

For the foregoing reasons, Mofield is not entitled to relief, and we affirm his judgment of sentence.[4]

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/18/2025

---

[4] On August 22, 2025, Mofield's appointed counsel, Daniel A. Alvarez, Esquire, filed an application to withdraw as counsel because he will begin working as a Philadelphia Assistant District Attorney on October 6, 2025. We **GRANT** counsel's application. The trial court is directed to appoint appellate counsel for Mofield within 14 days of the date of this Memorandum in the event Mofield intends to seek a discretionary appeal in the Pennsylvania Supreme Court. The Prothonotary of this Court is directed to forward a copy of this Memorandum to the Honorable Charles A. Ehrlich.